BARSAN, Extrx. et, Appellees, v. PIONEER SAVINGS & LOAN CO. et, Appellants.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 23102.   Decided July 28, 1954.

A. L. Kearns, A. R. Roman, David Perris, for plaintiff-appellees.
Roth & Pollack, for defendant-appellants.

(DOYLE, PJ, STEVENS and HUNSICKER, JJ, of the Ninth District, sitting by designation in the Eighth District.)

## OPINION

By HUNSICKER, J.

This is an appeal on questions of law and fact.

The plaintiffs in the trial court, appellees here, whom we will sometimes call, for the purposes of this opinion, Virginia Barsan, filed an action in the Common Pleas Court of Cuyahoga County, seeking an injunction to prevent The Pioneer Savings & Loan Co., its officers, and some of its directors, from holding a meeting to authorize stock subscriptions, and to compel the Savings & Loan Co. to set aside a cancellation of stock. In this opinion the defendants in the trial court, appellants here, will sometimes be referred to as Savings & Loan Co.

The Pioneer Savings & Loan Co. filed an answer and cross-petition, and the defendant officers and directors filed general denials, to the petition of Virginia Barsan. A reply to the answer and an answer to the cross-petition was filed by Virginia Barsan.

The claims of the parties are founded on the following facts:

On April 14, 1948, at a regular meeting of the board of directors of The Pioneer Savings & Loan Co. (then known as Romanian Savings & Loan Co.), a resolution was duly adopted to issue corporate stock at the price of $105 per share. This resolution reads as follows:

"T. Andrica seconded by D. Radu made a motion to issue new stock at the price of $105.00 and the sale to be concluded not later than June 30, 1948. The new stock may be bought on Running Stock and the subscribers should make monthly payments of not less than 1.00 for each share, with an initial payment of minimum 10.00 from which sum $5.00 will be attributed to the Reserve Fund. The motion was approved with unanimous roll call vote."

On May 5, 1948, the board of directors of the Savings & Loan Co. approved the minutes of the meeting at which the above resolution to issue stock had been adopted.

At the annual stockholders' meeting held on January 17, 1949, a stockholder-director asked about the new issue of stock. These minutes indicate a lengthy discussion and that the stockholders "were satisfied with the explanation given to them."

At the time this resolution of April 14, 1948, was adopted, there was issued and outstanding 536 shares of permanent, nonwithdrawable stock. There was also outstanding, running stock and paid-up stock. Sections 15, 16 and 17 of the bylaws of the Savings & Loan Co. provided for this stock classification. All of the stock, except the permanent, nonwithdrawable stock, could be repurchased by the Savings & Loan Co. if not fully paid for, or it could be withdrawn or forfeited. In the event of withdrawal or forfeiture, such stock could be reissued.

The constitution of the Savings & Loan Co. in Section 2 of Article III provides that: "Stock may be issued to members in whole or fractional shares, upon such terms and conditions as the bylaws may provide."

Section 21 of the bylaws of the Savings & Loan Co. says:

"The board of directors may require any member, except holders of Permanent Stock, to surrender his passbook or certificate and receive

the amount standing to his credit, together with all dividends declared and remaining unpaid thereon. All cancellations of stock shall be made only in the reverse order from that in which it was issued and all rights as members shall cease with the notice to surrender."

After the resolution of April 14, 1948, wherein stock was authorized, subscriptions for 511 shares were made. The appellees were among those who subscribed and paid for this new stock. Certificates for permanent stock pursuant to such subscriptions were issued and given to the various appellees, including Virginia Barsan. These stock certificates were dated December 12, 1952, except as to one stockholder, whose certificate was dated December 1, 1952.

It may be noted that, at the annual meeting on January 19, 1953, inquiry relative to the increase in permanent stock was made by a stockholder, who was informed that those who had subscribed for stock pursuant to the resolution of April 14, 1948, were required by the directors at the meeting of December 11, 1952, to pay for such stock during the month of December, 1952, or lose their right to purchase the stock. The minutes of this stockholders' meeting indicate a lengthy discussion of the right of the corporation to issue new stock, and the failure to give stockholders their pre-emptive rights. It was also pointed out in the minutes by the statements of shareholders that the stockholders had approved the new stock issue at the stockholders' meeting held January 17, 1949, and no further question or inquiry relative to the problem had been raised at other stockholder meetings until at this meeting of January 19, 1953.

At the directors' meeting held on February 18, 1953, a letter from the superintendent of Building and Loan Associations of the State of Ohio was read and made a part of the minutes. In this letter, inquiry relative to the new issue of permanent stock was made, because certain shareholders had made such inquiry of the superintendent of Building and Loan Associations. The minutes also show that Mr. Benson M. Smith, the superintendent of Building and Loan Associations, was present at this meeting. It should be stated here that, as early as the joint report of examination of the Savings & Loan Co., made January 5, 1949, by the Division of Building and Loan Associations and the Home Loan Bank Board, this report noted that certain running stock credits were actually subscriptions for permanent stock.

At the directors' meeting held May 6, 1953, the following resolution was adopted (those plaintiffs who were directors voted against such resolution):

"Because of the insufficiency of the information given those who were members of the board relative to the rights of the shareholders of this institution; and because of the improper manner in which the proponents of the resolution to increase the number of shares of the capital stock of this institution have acted during the shareholders' meeting in the year of 1949 and also during the general meetings held during the year 1948, it is necessary that we protect the rights of all of the stockholders of this institution; and now in conformity with the laws of Ohio, and particularly §8623-35 GC, relative to the pre-emptive

rights of shareholders of a corporation, and in accordance with such Act passed by the General Assembly of Ohio, we hereby realize that such acts of the board of directors at that time were occasioned through misinformation to the disadvantage of all of the shareholders of this institution, and it is thererfore necessary that we rescind the action of the board of directors held in 1949 at the shareholders' meeting and at the regular meetings to increase the stock of this institution by five hundred and eleven (511) shares.

It is therefore proposed that the actions of the board of directors resulting in increase of the capital stock of this institution by 511 shares be now rescinded, and all of such shares issued be cancelled and dividend action upon such shares so issued shall be foregone and no dividends to be paid upon such shares; and that all monies paid for such shares shall be refunded to the persons in whose name such stock is now issued. Such monies shall be immediately segregated and placed in a special account or fund for disbursement to such persons holders of such stock without any interest excepting upon such person's request such monies may be deposited as a savings account, properly identified by pass-books, to receive the benefits as depositors under the rules of this institution."

The president of the Savings & Loan Co. thereafter called a special stockholders' meeting for October 3, 1953, for the declared purpose of giving pre-emptive rights to purchase additional stock in the proportion owned by the stockholders on April 14, 1948.

The instant action was then filed in the Court of Common Pleas, asking the court: to remove the cloud on the title to the stock, purchased by plaintiffs as a result of the issue authorized on April 14, 1948; to compel the Savings & Loan Co., and its officers and directors, to set aside the order of cancellation of such stock; and to permanently enjoin the meeting called for October 3, 1953. The appellees here, except T. Andrica, were not directors on April 14, 1948. Elie Barsan, now deceased, the founder, president and director of the corporation. did subscribe for stock, and his estate is represented as a plaintiff through his wife as executrix.

The cross-petition of the appellant Pioneer Savings & Loan Co. asks that the stock issued as a result of the April 14, 1948, meeting be cancelled and the certificates be ordered returned to the Savings & Loan Co.; that the appellees be denied any rights in such stock; and that the appellees be restrained from interfering with the Savings & Loan Co. and its officers in holding the meeting previously called for October 3, 1953.

The very complicated and lengthy fact situation in this case may be stated briefly in the question to be decided by this court, which is: Did The Pioneer Savings & Loan Co., through its present directors, have the right to order a cancellation of the shares of stock issued as a result of the subscriptions made pursuant to the resolution of April 14, 1948?

It is clear, as shown by the evidence in this case, that, although the payments for the stock ordered sold by the resolution of April 14,

1948, were to be paid for in installments as "on Running Stock," nevertheless, all directors, officers, savings and loan examiners, and stockholders present at the meeting on January 17, 1949, knew that the subscriptions were for new, permanent capital shares, and not for any other classification of stock. The form of subscription which each person signed was for "capital stock of The Romanian Savings & Loan Co."

There is some evidence that, by personal contact and oral conversation on the part of the then president and other officers, stockholders other than those who subscribed for the new issue of 511 shares were given an opportunity to buy this stock.

Sec. 8623-35 GC (now §1701.40 R. C.), provides for the pre-emptive rights of shareholders. The written records of the corporation in evidence do not show that such rights were granted to the shareholders. Does that fact justify the action taken by the board of directors in ordering the stock cancelled? No stockholder, so far as the evidence before us is concerned, has sought to enforce his rights by way of a legal action. We do not express any opinion in such a matter, for that is not the problem before this court; however, it may be noted that a stockholder may waive or relinquish his right to subscribe to an issue of new stock. See 52 A. L. R. 226, et seq.; 138 A. L. R. 529, et seq.

There is no complaint made in this case that the Savings & Loan Co. had no right to sell additional stock; and, from the action of the present objecting officers and objecting directors, it is evident that the complaint which brought about the present action is that certain shareholders were not immediately, after April 14, 1948, given a right to subscribe to their respective proportionate shares.

The fact that 511 shares of stock were subscribed for and sold, did not cause the Savings & Loan Co. to lose money or decrease its earning power, and it did not in any other way cause the Savings & Loan Co. injury. It must be presumed that, by an increase in capital, when put to productive use, an increase in earning power resulted.

What harm, then, has been done the Savings & Loan Co. as a corporate entity? It committed no act beyond its powers in authorizing the issue of additional permanent capital shares. The wrong, if so it now is, was in the method of distribution and sale of those shares. Does the corporation, after all that transpired, and after the several stockholders' meetings where the subject of such new shares was discussed, have the power to cancel those shares and order a resale to all shareholders? We do not think the corporation can now lawfully exercise such power.

Let us assume that, after the subscriptions for new stock had been executed, the Savings & Loan Co. became insolvent. Would the subscribers to new stock, in a suit to collect unpaid stock subscriptions, be permitted to set up the failure to grant pre-emptive rights? We think not, for even an irregularity in the proceedings authorizing the increase would not prevent a receiver from collecting the amounts subscribed for such stock.

"3. Irregularities in the proceedings to increase the stock, or unauthorized provisions as to such stock, ex gra., that no notice of the

meeting of stockholders was given, that a part of the stock was declined by the stockholders without actual apportionment of it, or that the agreement contained a stipulation that the original stockholders should have part of the shares without paying for the same in money, will not defeat an action to recover on a subscription for such increased stock for the purpose of paying debts, where such subscriber, having knowledge of the facts, acquiesced until the company became insolvent."

Clarke v. Thomas, Receiver, 34 Oh St 36.

See also: 10 O. Jur., Corporations, 270, Sec. 182.

It must be remembered that in the instant case the stock subscriptions signed by the plaintiffs, although then executory contracts between the subscribers and the corporation, became fully executed when, upon payment by the subscribers, the stock certificates were issued by the corporation (Savings & Loan Co.) to such subscribers for the new stock. There is no indication that the subscriptions were obtained by fraud, either on the part of the purchasers or the Savings & Loan Co.

When this stock was issued by the Savings & Loan Co., it held no lien on such stock "unless the right of the corporation (Savings & Loan Co.) to such lien or the restriction is stated upon the certificate." (Sec. 8673-15 GC, now §1705.18 R. C.) There is no evidence to indicate that the Savings & Loan Co. reserved any lien or placed any restriction on this new permanent stock issue.

A stockholder and the corporation in which he owns shares are distinct persons in law. Bates v. Firestone, 20 Oh Ap 51, at p. 65. Generally, a stockholder, who is not a director, is not charged with notice concerning the conduct of the affairs of the corporation. Greenville Gas Co. v. Reis, et al, 54 Oh St 549, at p. 558.

Pre-emptive rights to subscribe to stock, it must again be pointed out, are, according to the statute, rights given to existing stockholders of such corporation; and, as pointed out above, the stockholder deprived of such right may have a remedy in equity. See 52 A. L. R. 241. The injury, if one has occurred, sought to be redressed in such an action, is one belonging to those who were shareholders at the time the new issue of stock was offered for sale.

We have searched the authorities in Ohio, and find no case where the facts are similar to the facts in the instant case.

11 Fletcher, Cyclopedia Corporations (Perm. Ed.), Sec. 5135, et seq., discusses the pre-emptive rights of stockholders, and, in Sec. 5160, this text with citation of authorities says (at pp. 317-320):

"Thus, in disposing of it (increased stock issue), the directors or majority of the stockholders cannot discriminate between the stockholders, nor issue it to themselves, or to their nominees, either for the purpose of making a profit for themselves out of the transaction, or for the purpose of obtaining or retaining control of the corporation. * * *. If they attempt to do so, they commit a fraud upon the other stockholders, against which a court of equity will grant relief, unless the right to relief is barred by laches or acquiescence. And stock so issued will be cancelled where the person to whom it is issued is a party to the

fraud, although not where it has come into the hands of a bona fide purchaser for value." (Portion in parenthesis· added.)

The same text in Sec. 5166 (at pp. 348-349), when speaking of the right of a corporation to cancel invalid stock certificates, says:

"The right to procure a cancellation of stock illegally issued may be barred by the statute of limitations, or lost by laches. * * *. Relief by cancellation of certificates may also be barred by the estoppel of the corporation or the stockholders to deny the validity of their issuance or that of the stock they represent."

In the instant case we have detailed the salient facts, setting out that no fraud was perpetrated on the corporation when the new permanent capital stock was issued. The stockholders had notice at the next succeeding regular stockholders' meeting of January 17, 1949, that subscriptions for such new stock would be received, and that in due time new permanent capital shares would be issued to the subscribers. Under these and all the attending facts and circumstances of this case, the corporation cannot now cancel and hold for naught this increase in capital shares.

It is therefore, the judgment of this court that the relief sought by the appellees be granted. Appellant shall pay the costs. Exceptions granted to appellants.

DOYLE, PJ, STEVENS, J, concur.